IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHY J. BUERHLE, | : | |
| Plaintiff. | : | CIVIL ACTION |
| | : | No. 13-3474 |
| v. | : | |
| HAHN, et al., | : | |
| Defendants. | : | |

**January 14, 2014**                                                                 **Anita B. Brody, J.**

### MEMORANDUM

Plaintiff Kathy J. Buerhle ("Buerhle"), Administratrix of the Estate of Sean Buerhle, brings suit against Defendants, Pennsylvania State Police Troopers, Trooper Hahn and Trooper John Doe (collectively, the "Troopers") under 42 U.S.C. § 1983, alleging a deprivation of substantive due process under the Fourteenth Amendment. Additionally, Buerhle brings a wrongful death claim, 42 Pa. Cons. Stat. Ann. § 8301, and a survival claim, 42 Pa. Cons. Stat. Ann. § 8302. I exercise federal question jurisdiction over Buerhle's § 1983 claim pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Buerhle's state law claims pursuant to 28 U.S.C. § 1367. Currently before me is Trooper Hahn's motion to dismiss. As tragic as the facts of this case may be, I am required under the law to grant Trooper Hahn's motion to dismiss.

### I. BACKGROUND[1]

At the age of 22 years old, Sean Buerhle ("Sean") took his own life. Plaintiff Kathy J. Buerhle is Sean's mother and the administratrix of his estate. Prior to his suicide, Sean had a history of mental health issues, including anxiety and debilitating panic attacks. Sean was under

---

[1] All facts are taken from the Complaint and construed in the light most favorable to Buerhle. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)

1

the care of a mental health professional and was taking Cymbalta, a prescription drug intended for the treatment of major depression disorders. Sean had a family history of depression and suicide. Both Sean's father and cousin had committed suicide. At the time of his death, Sean was a student at Drexel University and an employee of Weis Supermarket ("Weis"). He was living with his mother, Buerhle, and his stepfather.

On August 8, 2011, Sean left home to go to work the midnight shift at Weis. On August 9, 2011, Sean did not return home after work. Buerhle called Weis and learned that Sean never arrived at work. Buerhle became concerned for Sean's safety. She called his cellphone, but Sean did not answer. Additionally, Buerhle contacted Sean's friends, but none of them had seen him. Sean's stepfather then contacted the local State Police Department to file a missing person's report.

On the night of August 9, 2011, Pennsylvania State Police Troopers, Defendants Trooper Hahn and Trooper John Doe arrived at Buerhle's house to investigate Sean's disappearance. Buerhle informed the Troopers of Sean's mental health issues, his family history of depression and suicide, and that Sean's entire bottle of Cymbalta was missing. The Troopers refused to ping Sean's cellphone, which is a method whereby a cellphone service provider can pinpoint a subscriber's last known location by determining the closest cellphone tower that was accessed by the subscriber's cellphone. The Troopers provided Buerhle with the case number K03-1796778, and led Buerhle to believe that they had properly reported and submitted a missing person's report.

Following her discussion with the Troopers, Buerhle investigated Sean's bank, cellphone, and computer records, which reflected that Sean had not withdrawn any money or used his cellphone after disappearing. Buerhle also contacted all local hospitals and posted numerous

missing person signs in her neighborhood.

On August 11, 2011, Buerhle went to the local State Police Department to obtain a copy of Sean's missing person report in order to notify local media about her son's disappearance. Buerhle gave the station dispatcher the case number provided by the Troopers. The dispatcher informed Buerhle that that the Pennsylvania State Police Department had no information in its system associated with case number K03-1796778. A trooper then interviewed Buerhle and filed a missing person's report. Shortly after leaving the station, Buerhle went to the Upper Perkiomen Police Station and dropped off missing person fliers.

On the morning of August 12, 2011, various members of the Pennsylvania State Police Department arrived at Buerhle's home to search Sean's room, and created a search team to locate Sean. Around 11:30 p.m. on August 12, 2011, members of the search team notified Buerhle that they found Sean's body in the woods with a suicide note. Members of the team informed Buerhle that they located Sean's body after pinging his cellphone to ascertain his last known location and then using K-9 units to ascertain his exact location. After performing an autopsy, the Montgomery County Coroner's Office concluded that Sean committed suicide sometime between the night of August 11th and the early morning of August 12th.

The Pennsylvania State Police Department has a protocol known as the Missing Endangered Person Advisory System ("MEPAS"), which rapidly disseminates information about a missing person to the public and other law enforcement agencies. Sean's disappearance met the criteria under MEPAS for issuing a missing endangered person alert. Despite this, the Troopers failed to request an issuance of a MEPAS alert, and failed to properly file a missing person's report.

**II. STANDARD OF REVIEW**

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document integral to or explicitly relied upon in the complaint may be considered . . . ." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis omitted) (citations omitted) (internal quotation marks omitted). Thus, a court may "consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994). Further, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension*

4

*Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

**III. DISCUSSION**

**A. Substantive Due Process Claim**

To state a claim under § 1983, a plaintiff must allege a deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law. *Phillips*, 515 F.3d at 235. Buerhle's § 1983 claim rests on the Troopers' alleged deprivation of Sean's right to substantive due process under the Fourteenth Amendment. Both parties agree that Trooper Hahn was acting under the color of state law. Trooper Hahn argues that Buerhle's § 1983 claim should be dismissed because the Complaint fails to allege a constitutional deprivation.[2]

The Due Process Clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause prevents the Government from abusing its power or using it as an instrument of oppression." *Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007). Generally, however, the Due Process Clause does not impose an affirmative duty on the state to protect its citizens. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-200 (1989). An exception to this general rule is the state-created danger theory, which recognizes that "the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013).

To prevail on a substantive due process claim under the state-created danger theory,[3] a

---

[2] Trooper Hahn also argues that he is entitled to qualified immunity. It is unnecessary to address Trooper Hahn's qualified immunity argument because, as will be explained below, no constitutional deprivation occurred. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.")

[3] Buerhle argues that her substantive due process claim is viable even if it does not meet the requirements

plaintiff must prove the following four elements:

>  (1) the harm ultimately caused was foreseeable and fairly direct;
>
>  (2) a state actor acted with a degree of culpability that shocks the conscience;
>
>  (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
>  (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (footnotes omitted) (internal quotation marks omitted). Trooper Hahn argues that Buerhle cannot establish the first, second, and fourth elements of the test. Buerhle's claim cannot succeed if she fails to establish any single element. Because Buerhle cannot establish the fourth element, the requirement of an affirmative act, it is unnecessary to analyze any additional elements.

To satisfy the fourth element of a state-created danger claim, a plaintiff must allege that "defendants acted affirmatively to create a risk of danger that would otherwise not have existed." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2008). "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282. Moreover, "[t]here must be a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher*, 455 F.3d at 432. "Accordingly, the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff." *Id*.

Buerhle argues that the Troopers took affirmative acts that rendered Sean more vulnerable to danger when they: (1) refused to ping Sean's cellphone to try and locate Sean; (2)

---

of the state-created danger theory. However, a substantive due process claim under the state-created danger theory is Buerhle's only possible avenue for success because of the general rule that the Due Process Clause does not impose an affirmative duty on the state to protect its citizens. *See DeShaney*, 489 U.S. at 195-200.

6

failed to request issuance of a MEPAS alert; and (3) provided Buerhle with a case number and assured her that they would actively search for Sean and file a missing person's report. However, the Court of Appeals for the Third Circuit has rejected similar claims in several cases.

In *Bright v. Westmoreland County*, Charles Koschalk was sentenced to 23 months of probation for corrupting the morals of a twelve-year-old girl. 443 F.3d at 278. Although it was a condition of his parole that Koschalk would have no contact with the twelve year-old-girl (the "girl"), Koschalk continuously violated his parole by contacting the girl. *Id*. Even though the probation officer personally witnessed Koschalk with the girl and confronted him, there was a ten-week delay between the reported violation and the date scheduled for a parole revocation hearing. *Id*. at 278-79. During this ten-week period, the girl's father contacted a police officer and requested that the officer arrest Koschalk. *Id.* at 279. Despite the officer's assurance to the father that immediate action would be taken, Koschalk was not detained. *Id.* Before Koschalk's parole revocation took place, Koschalk killed the girl's eight-year-old sister (the "victim") in retaliation for the family's efforts to keep him away from the girl. *Id.*

The father argued that the state-actor defendants had caused the victim's death when: (1) they inexplicably delayed the probation revocation hearing for ten weeks; (2) the police officer assured the father that Koschalk would be taken into custody, which resulted in the father failing to take his own steps to protect his family; and (3) the probation officer confronted Koschalk while he was with the victim. *Id.* at 283. The Third Circuit rejected all of these arguments on the basis that none of the allegations in the Complaint amounted to an affirmative act "of the defendants that utilized their state authority in a manner that rendered [the victim] more vulnerable to Koschalk than she would otherwise have been." *Id.* at 284. Additionally, the Third Circuit rejected the argument that the victim was rendered more vulnerable to harm by the police

officer's assurance that Koschalk would be arrested because the father "does not, and cannot, claim that the state in any way restricted his freedom to act on his own family's behalf." *Id.*; *see also Sanford v. Stiles*, 456 F.3d 298, 312 (3d Cir. 2006) (guidance counselor did not render boy who committed suicide more vulnerable to harm by cutting him off from the aid of his mother because she "did not in any way interfere with [the mother's] parental relationship with her son . . . [or] suggest that [the boy] not speak with his mother").

In *Ye v. United States*, the Third Circuit similarly rejected the argument that a "mere assurance" can be an affirmative act that satisfies the fourth element of a state-created danger claim. 484 F.3d at 635. Ye visited Dr. Kim six times between February 6, 2001 and March 5, 2002 at Philadelphia's District Health Care Center No. 10, a health center operated by the Philadelphia Department of Public Health. *Id.* Dr. Kim diagnosed Ye with hypertension, coronary artery disease, and angina. *Id.* at 635-36. On March 5, 2002, Ye visited Dr. Kim and complained of shortness of breath, discomfort in his upper body area, and coughing. *Id.* Dr. Kim told Ye that "there is nothing to worry about and that he is fine." *Id.* (internal quotation marks omitted). Dr. Kim told Ye to return in three months and gave him a prescription for cough medicine. *Id.* Based on Dr. Kim's assurance that he was fine, Ye went home and did not seek emergency medical assistance. *Id.* Later that day, Ye's son found him unconscious and he was rushed to the hospital. *Id.* It was determined that Ye had experienced a myocardial infraction and was suffering from congestive heart failure. *Id.* Two experts agreed that Dr. Kim's conduct was outrageous, and that Dr. Kim should have given Ye a complete cardiac workup and immediately hospitalized Ye for emergency medical treatment. *Id.* at 636. Ye brought suit under the state-created danger theory. *Id.* at 640. The Third Circuit held that Ye could not succeed in his suit because an assurance is not an affirmative act within the meaning of the

fourth element of a state-created danger claim. *Id.* at 640-41.

In this case, the Troopers refusal to ping Sean's cellphone and failure to request issuance of a MEPAS alert are failures to act that cannot be recast as affirmative acts that rendered Sean more vulnerable to danger. Likewise, as held in *Bright* and *Ye*, the Troopers' assurance that they would actively search for Sean and file a missing person's report also does not amount to an affirmative act. Buerhle argues that the Troopers rendered Sean more vulnerable to harm by providing her with a case number and assuring her that they would search for Sean because their assurances caused her to refrain from actively searching for Sean. However, the Troopers never restricted Buerhle's ability to search for Sean. In fact, Buerhle continued to search for Sean after she spoke with the Troopers by checking Sean's cellphone, bank, and computer records; contacting local hospitals; and posting numerous missing person signs. The Troopers' assurances did not make Sean more vulnerable to harm because they did not prevent Buerhle or anyone else from helping Sean. *See Bright*, 443 F.3d at 284; *Sanford v. Stiles*, 456 F.3d at 312. "[A]n assurance, in this case an expression of intent to help, is not an affirmative act sufficient to trigger constitutional obligations." *Ye*, 484 F.3d at 641.

"[T]he requirement of an actual affirmative act is not intended to turn on semantics of act and omission. Instead, the requirement serves . . . to distinguish cases where . . . officials might have done more . . . from cases where . . . officials created or increased the risk itself." *Morrow*, 719 F.3d at 179 (internal quotation marks omitted). Buerhle cannot meet the fourth element of the state-created danger test because the Troopers did not take any affirmative acts nor were their alleged "actions" the "'but for cause' of the danger faced by [Sean]." *Kaucher*, 455 F.3d at 432. While the Troopers may have failed to prevent Sean's death, they did not cause or increase the risk that he would commit suicide. Therefore, I will grant Trooper Hahn's motion to dismiss

Buerhle's substantive due process claim.

**B. State Law Claims**

Buerhle brings a wrongful death claim, 42 Pa. Cons. Stat. Ann. § 8301, and a survival claim, 42 Pa. Cons. Stat. Ann. § 8302. Trooper Hahn argues that both claims should be dismissed because he is an employee of the Commonwealth entitled to statutory sovereign immunity.[4]

Pennsylvania's sovereign immunity statute provides "that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa. Cons. Stat. Ann. § 2310. The General Assembly has waived sovereign immunity in nine narrow circumstances that both parties agree are not applicable in this case.[5] *See* 42 Pa. Cons. Stat. Ann. § 8522.

Buerhle first argues that Trooper Hahn is not entitled to immunity because he is being sued in his individual capacity. However, "Sovereign immunity . . . applies to Commonwealth employees in both their official and individual capacities, so long as the employees are 'acting with[in] the scope of their duties.'" *Larsen v. State Employees' Ret. Sys.*, 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008) (quoting *Maute v. Frank*, 657 A.2d 985, 986 (Pa. Super. Ct. 1995); *see also Robinson v. Beard*, 2013 WL 6022124, at *8 (E.D. Pa. Nov. 13, 2013).

Buerhle next contends that Trooper Hahn is not entitled to sovereign immunity because

---

[4] Trooper Hahn also argues that Buerhle fails to state a wrongful death claim or survival act claim. It is unnecessary to address this argument because, as will be explained below, Trooper Hahn is entitled to sovereign immunity.

[5] The nine narrow exceptions to sovereign immunity are: (1) Vehicle liability; (2) Medical-professional liability; (3) Care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) Potholes or other dangerous conditions; (6) Care, custody or control of animals; (7) Liquor store sales; (8) National Guard activities; and (9) Toxoids and vaccines. 42 Pa. Cons. Stat. Ann. § 8522(b).

his actions were outside the scope of his employment.  According to the Third Circuit, Pennsylvania has accepted the Restatement (Second) of Agency's definition of conduct within the scope of employment.  *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d Cir. 2000).  According to the Restatement, conduct is within the scope of employment if:

> (a) it is of the kind [the employee] is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master; and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

Restatement (Second) of Agency § 228.

Buerhle argues that Trooper Hahn acted outside of the scope of his employment when he "failed to properly follow department procedure and/or protocol [and] failed to properly, and timely, file a missing person's report, or request the issuance of a MEPAS alert."  Pl.'s Resp. 17. "Under Pennsylvania law, even unauthorized acts may be within the scope of employment if they are clearly incidental to the master's business." *Brumfield*, 232 F.3d at 381 (internal quotation marks omitted).  Moreover, according to the Restatement (Second) of Agency:

> If the master employs a servant to speak for him, he is subject to liability if the servant makes a mistake as to the truth of the words spoken or as to the justification for speaking them, or even if he speaks with an improper motive, provided that he acts at least in part to serve his employer's purposes. The master may be liable even though the servant knows the statement to be untrue . . . .

Restatement (Second) of Agency § 247 cmt. c.; *See also*, *Brumfield*, 232 F.3d at 381 (applying Restatement § 247 to determine whether the defendants acted within the scope of their employment); *Aliota v. Graham*, 984 F.2d 1350, 1359 (3d Cir. 1993) (predicting that the Pennsylvania Supreme Court would adopt Restatement § 247).

The Complaint alleges that Trooper Hahn was sent to Buerhle's house to investigate

Sean's disappearance after Sean's stepfather contacted the local State Police Department to file a missing person's report.  Trooper Hahn visited Buerhle's house in the course of his duty as a state trooper.  During his visit, Trooper Hahn refused to ping Sean's cellphone, provided Buerhle with a case number for a case that did not exist, and led Buerhle to believe that he had properly reported and submitted a missing person's report.  Additionally, Trooper Hahn never requested issuance of a MEPAS alert.  All of Trooper Hahn's actions were of the type that he was employed to perform, occurred within the authorized time and space limits of his position as a trooper, and were calculated with the purpose to serve his employer, the local State Police Department.  Even if Trooper Hahn failed to follow department procedure and/or office protocol when he refused to ping Sean's cellphone or request issuance of a MEPAS alert, the purpose of his investigation into Sean's disappearance was to serve the local State Police Department, and these unauthorized acts were incidental to that purpose.  Additionally, when Trooper Hahn spoke with Buerhle he did so at the behest of the local State Police Department.  Thus, when he provided Buerhle with a case number for a nonexistent case, he was still acting within the scope of his employment.  Trooper Hahn is entitled to statutory sovereign immunity because all of his conduct was within the scope of his employment.  Therefore, I will grant Trooper Hahn's motion to dismiss the wrongful death and survival claims.

**IV. CONCLUSION**

For the reasons set forth above, I will grant Trooper Hahn's motion to dismiss.

s/Anita B. Brody

_____
ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:               Copies **MAILED** on _____ to: